UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MAUREEN LAGRONE,

Plaintiff,

v.

ADVANCED CALL CENTER TECHNOLOGIES, LLC,

Defendant.

CASE NO. C13-2136JLR

ORDER STAYING CASE AND COMPELLING ARBITRATION

## I. INTRODUCTION

This matter comes before the court on Defendant Advanced Call Center Technologies, LLC's ("Advanced Call Center") motion to dismiss and to compel arbitration. (Mot. (Dkt. # 35).) This case arises from Advanced Call Center's attempts to collect Plaintiff Maureen Lagrone's credit card debt. Having considered the submissions of the parties, the balance of the record, and the relevant law, and no party having requested oral argument, the court GRANTS Advanced Call Center's motion to compel

arbitration but DENIES Advanced Call Center's motion to dismiss. The court STAYS the case pending completion of arbitration.

## II. BACKGROUND

### A. Ms. Lagrone's Claims

GE Capital Retail Bank ("GE Capital"), a former defendant to this case, issued Ms. Lagrone a personal credit card under a J.C. Penney label. (*See* Am. Compl. (Dkt. # 21) ¶ 13.) Advanced Call Center, in turn, entered into an agreement with GE Capital to collect debts on behalf of GE Capital. (Supp. Keller Decl. (Dkt. # 46) ¶ 2.) When Ms. Lagrone allegedly fell behind on her credit card payments, GE Capital placed her account with Advanced Call Center for collection purposes. (Keller Decl. (Dkt. # 37) ¶ 2.)

In November, 2012, Advanced Call Center sent an initial debt validation letter to Ms. Lagrone. (*Id.* Ex. A ("Letter").) Ms. Lagrone alleges that the substance of this letter violates numerous provisions of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* (*See generally* Am. Compl.) Ms. Lagrone, who seeks to bring this suit as a class action, originally named both GE Capital and Advanced Call Center as defendants. (*See* Compl. (Dkt. # 1).) GE Capital has since reached a settlement agreement with Ms. Lagrone and has been dismissed from the action. (*See* Koehler Decl. (Dkt. # 38) ¶ 11; Stip. Order (Dkt. # 26).)

Advanced Call Center now moves to compel Ms. Lagrone to arbitrate her claims. (*See* Mot.) The court has stayed Ms. Lagrone's motion for class certification (Mot. to Cert. (Dkt. 30)) pending resolution of the motion to arbitrate. (*See* 8/15/14 Order (Dkt. # 44).)

**B. The Arbitration Provision**

Advanced Call Center's motion is predicated on the arbitration provision found in the J.C. Penney Rewards Credit Card Account Agreement ("Agreement") between GE Capital and Ms. Lagrone. The most recent version of this Agreement, which Ms. Lagrone received in June 2012, provides:

> If either you or we make a demand for arbitration, you and we must arbitrate any dispute between you . . . and us, our affiliates, agents and/or J.C. Penney Corporation, Inc. if it relates to your account . . . .

(Koehler Decl. ¶ 8, Ex. A ("Agreement") at 2.) The Agreement defines "we," "us," and "our" to refer to GE Capital. (*Id.*) The Agreement provides that the cardholder is permitted to reject the arbitration provision by mailing in notice within 60 days of the effective date of the Agreement. (Agreement at 2; *see also* Koehler Decl. Ex. B at 1 (prior version of credit card agreement between GE Capital and Ms. Lagrone).) Ms. Lagrone did not opt out of the arbitration provision. (Koehler Decl. ¶ 9.)

The Agreement also contains a choice of law clause, which provides:

> This Arbitration section of your Agreement is governed by the Federal Arbitration Act (FAA). Utah law shall apply to the extent state law is relevant under the FAA.

(*Id.*) Although Advanced Call Center is not a signatory to this Agreement, it maintains that it is entitled to enforce the arbitration provision because either (1) GE Capital assigned Ms. Lagrone's credit card agreement to Advanced Call Center or (2) Advanced Call Center was acting as an agent of GE Capital when it attempted to collect Ms. Lagrone's credit card debt. (*See* Mot.)

**C. Advanced Call Center's Relationship with GE Capital**

The relationship between Advanced Call Center and GE Capital was governed by a Statement of Work. (Supp. Keller Decl. ¶ 2.) The Statement of Work provided that GE Capital would "place Accounts" with Advanced Call Center "for collection Services." (*Id.* Ex. A ("Statement of Work") ¶ 2.1.) "Accounts" were defined to include many kinds of debt, including credit card agreements. (*Id.* ¶ 1.6(a).) When an account was placed with Advanced Call Center for collection, the account's information was relayed to Advanced Call Center via a proprietary GE Capital computer program. (Supp. Keller Decl. ¶ 2.) Advanced Call Center was paid by GE Capital on an hours-worked basis, plus bonuses tied to the number and value of accounts it closed. (*See* Statement of Work Attach. A (describing compensation structure).) GE Capital retained the right to recall accounts from Advanced Call Center at any time. (Statement of Work ¶ 2.2)

Pursuant to the Statement of Work, Advanced Call Center was authorized to negotiate and settle accounts on behalf of GE Capital as long as Advanced Call Center operated within certain restrictions. Specifically, Advanced Call Center was "authorized to make a cash settlement on any Placed Account for a percentage of the face amount owed . . . that is equal to or greater than the percentage set forth . . . as communicated . . . in [GE Capital's] reference manual . . . provided that such settlement is paid according to written requirements provided by [GE Capital]." (*Id.* ¶ 2.3.) "All other settlements and settlement amounts and terms," however, were required to "receive prior written approval of [GE Capital]." (*Id.*)

Under the Statement of Work, Advanced Call Center agreed to "perform the Services in accordance with . . . written instructions provided . . . by [GE Capital]." (Agreement ¶ 3.1.) GE Capital issued written settlement guidelines that further defined the step-by-step process Advanced Call Center's employees were required to walk through when negotiating settlements with customers. (*See* Keller Decl. Ex. B ("Settlement Guidelines").) Among other things, these guidelines specified different scripts to be followed in different scenarios,[1] defined minimum percentage settlement values that varied depending on the stage of the debt and the type of credit card, established deadlines for offering settlements, and provided instructions for creating mandatory documentation in GE Capital's proprietary computer program. (*See generally id.*)

In addition, GE Capital controlled certain aspects of Advanced Call Center's staffing on collection accounts, retained the right to remove Advance Call Center employees from accounts at any time, required specific recordkeeping practices, mandated use of GE Capital's computer platform for reporting, and controlled Advanced Call Center's use of confidential information. (Keller Decl. ¶ 4.)

After Advanced Call Center first filed its motion to compel arbitration, the court postponed ruling on the matter until it received supplemental briefing and evidence from the parties regarding Advanced Call Center's relationship with GE Capital. (9/3/14

[1] For example, the scripts vary depending on whether the customer initiated the conversation, whether the call had been transferred, and what information the customer was able to verify. (*See* Settlement Guidelines.)

Order (Dkt. # 44).) Now that the parties have filed their supplemental materials, the matter is ripe for resolution. (*See* ACC Supp. (Dkt. # 45); Lagrone Supp. (Dkt. # 47).)

## III. ANALYSIS

### A. Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes arising out of transactions involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "By its terms, the Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Accordingly, a court's role is limited to determining: (1) whether an arbitration agreement exists between the parties, and, if so, (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. *Id.*

Regarding the first prong, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Generally, the contractual right to compel arbitration "may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration." *Id.* The Supreme Court, however, "has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows

the litigant to enforce the agreement." *Id.* at 1128 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). Accordingly, federal district courts look to state law to determine whether a nonsignatory to an agreement containing an arbitration provision is nonetheless entitled to enforce the provision. *Id.* (applying California state law); *see also Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) ("We therefore examine the contract law of California to determine whether Best Buy, as a nonsignatory, may seek arbitration . . . .")

On the other hand, regarding the second prong, "[t]he scope of an arbitration agreement is governed by federal substantive law." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). If a contract contains an arbitration clause, there is a presumption that the dispute is arbitrable. *AT&T Techs., Inc. v. Comm'ns Workers of America*, 475 U.S. 643, 650 (1986). In that case, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula*, 175 F.3d at 719.

**B. Advanced Call Center's Right to Arbitrate**

Pursuant to the caselaw discussed above, the court addresses first whether Advanced Call Center can enforce the arbitration provision against Ms. Lagrone under the relevant state law, and second, whether the parties' dispute falls within the substantive scope of the arbitration provision.

**1. Choice of Law**

The parties contend that, pursuant to the Agreement's choice of law clause, Utah law is the "relevant state contract law" that governs Advance Call Center's ability to compel arbitration. *See Kramer*, 705 F.3d at 1126; (Agreement at 2.) The court agrees.

Because this case is based on federal question jurisdiction, federal common law supplies the choice-of-law rules. *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997); (*see* Am. Compl. ¶ 2 (invoking federal question jurisdiction).) Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws. *See id.*; *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002). Section 187 of the Restatement applies where, as here, the contract at issue selects the law of a particular jurisdiction to govern disputes. *See Chan*, 123 F.3d at 1297; *Restatement (Second) of Conflicts of Laws* § 187.

According to Section 187, courts should enforce the parties' contractual choice of law if the issue "is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." *Restatement (Second) of Conflicts of Laws* § 187(1). Even if the parties could not have directed a contractual provision to the issue, courts should honor their choice unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue" and that state would be the state of applicable law in the absence of a choice of law clause. *Id.* at § 187(2); *see also Chan*, 123 F.3d at 1297.

Here, the issue of whether a collection agency working on behalf of GE Capital can invoke the Agreement's arbitration provision against a debtor is one that could have been resolved by an explicit provision in the Agreement. *See Restatement (Second) of Conflicts of Laws* § 187(1). Moreover, both parties agree that Utah law applies. (*See*

Mot.; Resp. (Dkt. # 39) at 7); *Kramer*, 705 F.3d at 1128, n.4. Accordingly, pursuant to the Agreement's choice of law provision, the court will apply Utah law to the question of who is entitled to invoke the arbitration provision. (*See* Agreement at 2.)

**2. Utah Contract Law**

The next question is whether Utah contract law allows Advanced Call Center to enforce the arbitration agreement against Ms. Lagrone. *See Kramer*, 705 F.3d at 1126 (citing *Carlisle*, 556 U.S. at 632). Advanced Call Center advances two theories as to why, as a nonsignatory to the Agreement, it is nevertheless permitted to enforce the arbitration clause: (1) GE Capital assigned Ms. Lagrone's credit card agreement to Advanced Call Center, and (2) Advanced Call Center was an agent of GE Capital. (*See* Mot.) Because the court finds that Advanced Call Center is permitted to enforce the arbitration clause as an agent of GE Capital, the court does not address the assignment theory.

When applying state law, "federal courts are bound by the pronouncements of the state's highest court on applicable state law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Id.* "In assessing how a state's highest court would resolve a state law question . . . federal courts look to existing state law without predicting potential changes in that law." *Id.*

Although the Utah Supreme Court has not yet explicitly addressed the question, based on related Utah precedent, the court concludes that Utah contract law permits a nonsignatory agent to enforce an arbitration provision of its principal's contract. The

Utah Supreme Court has held that, in general, "an agency relationship with a principal to a contract does not give the agent the authority to enforce a contractual term for the agent's own benefit." *Fericks v. Lucy Ann Soffe Trust*, 100 P.3d 1200, 1205-06 (Utah 2004) (preventing realtors from enforcing an attorneys' fees provision found in the sellers' contracts with the buyers). Since then, however, the Utah Supreme Court has recognized that, "under certain circumstances, a nonsignatory to an arbitration agreement can enforce or be bound by an agreement between other parties." *Ellsworth v. Am. Arbitration Ass'n*, 148 P.3d 983, 989 (Utah 2006). Specifically, in *Ellsworth*, the Utah Supreme Court found that "[t]raditionally, five theories for binding a nonsignatory to an arbitration agreement have been recognized: (1) incorporation by references; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel." *Id.* Accordingly, the Utah Supreme Court applied the agency theory to determine whether a nonsignatory to the contract at issue was bound by the contract's arbitration provision. *See id.*

Because *Ellsworth* is directed to a specific subset of contract law (namely, arbitration provisions), it can be read as providing an exception to *Fericks*' general rule that agents typically cannot enforce provisions of their principals' contracts. *Compare Ellsworth*, 148 P.3d at 989 *with Fericks*, 100 P.3d at 1205-06; *see also Nueterra Healthcare Mgmt.*, *LLC v. Parry*, 835 F. Supp. 2d 1156, 1161-62 (D. Utah 2011) (finding that *Ellsworth* is an exception to *Ferick*'s general rule). Although the Utah Supreme Court in *Ellsworth* considered only whether a nonsignatory agent was bound by an arbitration provision, the Court used language broad enough to encompass situations in which a nonsignatory seeks to enforce an arbitration agreement. *See Ellsworth*, 148 P.3d

at 989 ("[U]nder certain circumstances, a nonsignatory to an arbitration agreement *can enforce* or be bound by an agreement between other parties.") (emphasis added); *see generally Bybee v. Abdulla*, 189 P.3d 40, 47 (Utah 2008) (citing *Ellsworth*). Moreover, although precedent in this area is scarce, the few courts that have applied Utah law to this situation have interpreted *Ellsworth* as permitting nonsignatories to enforce arbitration provisions. *See, e.g.*, *Educators Mut. Ins. Ass'n v. Evans*, 258 P.3d 598, 614 (Utah Ct. App. 2011) (holding that a municipality's contractual right to compel arbitration extended to the insurance company serving as the municipality's agent); *CollegeAmerica Servs., Inc. v. W. Ben. Solutions, LLC*, No. 2:11CV01208 DS, 2012 WL 1559745, at *2-3 (D. Utah May 2, 2012) (applying *Ellsworth* to determine whether nonsignatory could enforce an arbitration agreement on the theory of estoppel); *see also NAFEP Mgmt. Co. v. Binkele*, No. 2:06-CV-369 TS, 2007 WL 1726435 (D. Utah June 12, 2007) (same). Accordingly, based on the available state guidance, the court predicts that, when faced with the question, the Utah Supreme Court would permit a nonsignatory agent to enforce an arbitration provision in its principal's contract. *See Ticknor*, 265 F.3d at 939; *Ellsworth*, 148 P.3d at 989.

**3. Utah Agency Law**

Having found that Utah law permits nonsignatory agents to enforce arbitration provisions in their principals' contracts, the next question is whether Advanced Call Centers was in fact an agent of GE Capital. "In order for an agency relationship to arise, three elements must exist: (1) the principal must manifest its intent that the agent act on its behalf, (2) the agent must consent to so act, and (3) both parties must understand that

the agent is subject to the principal's control." *Wardley Corp. v. Welsh*, 962 P.2d 86, 89 (Utah Ct. App. 1998); *see also Gildea v. Guardian Title Co. of Utah*, 970 P.2d 1265, 1269-70 (Utah 1998). The third element focuses on whether the principal "controls, or has the right to control, the manner in which the operations are to be carried out." *Sutton v. Miles*, 2014 UT App. 197, at * 2, ---- P.3d ---- (Utah Ct. App. Aug. 14, 2014) (citing *Mallory v. Brigham Young Univ.*, 332 P.3d 922, 928 (Utah 2014)). The following factors are relevant to, but not necessarily dispositive of, this element: "(1) the existence of covenants or agreements concerning the right of direction and control over the agent, (2) whether the principal has the right to hire and fire the agent, (3) the method of payment (i.e., wages versus payment for a completed job or project), (4) who furnishes the equipment, (5) the intent of the parties, and (6) the business of the employer." *Id.* at *3. Ultimately, "[w]hether an agency relationship exists depends upon all the facts and circumstances of the case. *Gildea*, 970 P.2d at 1269-70.

The court finds that all three elements of agency exist here. To begin, the Statement of Work executed by GE Capital and Advanced Call Centers evidences the first and second elements. Specifically, the Statement of Work is a binding contract in which (1) GE Capital manifests its intent that Advanced Call Centers act on its behalf to collect, negotiate, and settle debts owed to GE Capital, and (2) Advanced Call Centers consents to so act. (*See* Statement of Work ¶¶ 2.1, 2.3.)

Turning to the control element, the Statement of Work is an agreement concerning GE Capital's right to direct and control Advanced Call Centers' actions in collecting and negotiating settlements regarding outstanding accounts. *See Sutton*, 2014 UT App. 197,

at *3. The Statement of Work mandated that Advanced Call Centers could only settle accounts for the amounts specified by GE Capital and in the manner specified by GE Capital, and that any deviations from GE Capital's settlement guidelines must receive prior written approval from GE Capital. (Statement of Work. ¶ 2.3.) The Statement of Work also required Advanced Call Centers to operate in accordance with written instructions provided by GE Capital. (*Id.* ¶ 3.1) These written instructions included settlement guidelines, which provided scripts for Advanced Call Centers' employees to follow when negotiating settlements, established minimum settlement values for various scenarios, and set deadlines for settlements. (*See* Settlement Guidelines.)

Additionally, GE Capital retained the right to recall accounts from Advanced Call Center at any time, could choose not to place any accounts with Advanced Call Center at all, and exercised control over Advanced Call Center's staffing of accounts, which control included the right to remove employees from accounts at any time. (Statement of Work. ¶¶ 2.1, 2.2; Keller Decl. ¶ 4); *see Sutton*, 2014 UT App. 197, at *3. Moreover, Advanced Call Centers did not retain the debt payments it collected; rather, GE Capital compensated Advanced Call Centers on an hours-worked and bonus basis. (*See* Statement of Work Attach. A.) Finally, GE Capital mandated that Advanced Call Centers use a proprietary GE Capital computer system for recordkeeping, and specified the type of documentation that must be generated, as well as how confidential account information was treated. (*See* Keller Decl. ¶ 4; Supp. Keller Decl. ¶ 2.)

All of these facts show that GE Capital controlled the manner in which Advanced Call Center's collection operations were to be carried out. *See Mallory*, 332 P.3d at 928.

Accordingly, the third element of agency is also met.[2] *See id.* Because the facts and circumstances of this case show that Advanced Call Centers was serving as an agent of GE Capital, Advanced Call Centers can enforce the arbitration provision in GE Capital's Agreement against signatories to the Agreement.[3] *See Gildea*, 970 P.2d at 1269-70; *Ellsworth*, 148 P.3d at 989.

**4. Scope of the Arbitration Provision**

As discussed above, whether an arbitration agreement is enforceable by or against a particular party is a separate question from whether the parties' dispute falls within the substantive scope of the arbitration agreement. *See Kramer*, 705 F.3d at 1126. As such, the court turns to the second prong of the arbitrability inquiry: whether, under federal

//

---

[2] Ms. Lagrone contends that Advanced Call Centers was not an agent of GE Capital because the Statement of Work provided that Advanced Call Centers was acting "on a third party basis." (Lagrone Supp. at 6.) Ms. Lagrone, however, puts forth no authority supporting her assertion that acting "on a third party basis" is exclusive of acting as an agent. To the contrary, the Statement of Work defines services provided "on a third party basis" to be services provided "under the name of Service Provider." (Statement of Work ¶ 1.3.) The mere fact that Advanced Call Centers was not permitted to operate under the name "GE Capital" does not mean it was not serving as an agent of GE Capital.

[3] Ms. Lagrone contends that Advanced Call Centers cannot compel arbitration because, although the arbitration provision explicitly covers disputes with GE Capital's "affiliates [and] agents," the provision only applies "[i]f either you or we make a demand for arbitration," and the credit card agreement defines "we" to mean only GE Capital—not agents of GE Capital. (*See* Lagrone Supp. at 5 (citing Agreement).) The issue, however, is not whether the credit card agreement explicitly grants Advanced Call Center the right to arbitrate, but rather whether Advanced Call Center, as an agent of GE Capital, is entitled to assert GE Capital's contractual right to arbitrate in Advanced Call Center's own favor. *See Carlisle*, 556 U.S. at 632; *Ellsworth*, 148 P.3d at 989.

Indeed, in *Ellsworth*, the fact that the arbitration clause at issue applied only to "disputes between the Contractor and the Owner" did not prevent the Utah Supreme Court from considering whether the clause bound the "Owner's" putative agent. *See id.* at 986. Consistent with this authority, the court finds that the "you or we" language in the arbitration provision acts as a floor rather than a ceiling: it preserves Ms. Lagrone's right to compel agents of GE Capital to arbitrate, but does not preclude agents of GE Capital from compelling arbitration when so permitted under relevant state law.

substantive law, Ms. Lagrone's FDCPA claims against Advanced Call Centers fall within the Agreement's arbitration provision. The court finds that they do.

The credit card agreement's arbitration provision applies to any dispute between Ms. Larone and GE Capital, its affiliates, and it agents, that "relates to [Ms. Lagrone's] account." (*See* Agreement.) When evaluating arbitration agreements, courts give the language "relating to" a "broad" interpretation. *See Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994); *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922 (9th Cir. 2011). The Ninth Circuit has held that similarly broad arbitration clauses encompass any matters that "touch on" the relationship referenced by the arbitration provision. *See Simula*, 175 F.3d at 719; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 2650689, at *4 (N.D. Cal. July 6, 2011) (holding that an arbitration provision applicable to "any disputes related to" the parties' contract "includes matters that, while not arising directly under the contractual relationship, are nevertheless related to it").

Here, the arbitration provision references Ms. Lagrone's credit card account with GE Capital. (*See* Agreement at 2.) There can be no dispute that, as required by the arbitration provision, Ms. Lagrone's FDCPA claims against Advanced Call Centers "relate to" this account. (*See generally id.*) After all, Ms. Lagrone's claims are predicated solely on Advanced Call Centers' efforts to collect outstanding debt associated with that account. (*See generally* Am. Compl.) Ms. Lagrone does not seriously contend otherwise. (*See generally* Resp.; Lagrone Supp.)

This court recently held that FDCPA claims regarding improper attempts to collect credit card debt were "clearly covered" by an arbitration provision that applied to "all claims relating to [the plaintiff's] account." *See Coppock v. Citigroup, Inc.*, No. C11-1984-JCC, 2013 WL 1192632, at *5 (W.D. Wash. Mar. 22, 2013). The same result is appropriate here. Mindful of the federal policy that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," the court finds that Ms. Lagrone's FDCPA claims against Advanced Call Centers fall within the scope of the arbitration agreement. *See Simula*, 175 F.3d at 719; *Tracer Research*, 42 F.3d at 1295. With that last piece of the puzzle in place, the court concludes that Advanced Call Center has successfully shown that it is entitled to compel Ms. Lagrone to arbitrate this dispute.

**C. Waiver**

As a final matter, Ms. Lagrone urges the court to find that Advanced Call Center has waived any right to compel arbitration of this dispute that it may have once possessed. (Resp. at 12-13.) The court declines to do so.

"[A]ny party arguing waiver of arbitration bears a heavy burden of proof." *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 921 (9th Cir. 2009) (quoting *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758–59 (9th Cir. 1988)). To demonstrate waiver of the right to arbitrate, a party must show: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Id.*

Ms. Lagrone cannot succeed on the second or third requirements. Ms. Lagrone points out that the case was originally filed on November 25, 2013, and that Advanced

Call Center did not bring this motion until July 21, 2014—after Ms. Lagrone had already moved for class certification. (Resp. at 12.) Ms. Lagrone argues that this delay gave Advanced Call Center an unfair advantage, because Advanced Call Center "was able to access the likelihood of having a class certified against it, and to reassess its chances of winning the case." (*Id.* at 13.)

The court notes, however, that Advanced Call Center initially filed a motion to compel arbitration much earlier in the case—specifically, in March, 2014. (1st Mot. (Dkt. # 15).) At the time, Ms. Lagrone demanded that Advanced Call Center provide an authenticated copy of the credit card agreement that Advanced Call Center contended allowed it to compel arbitration. (*See* Withdrawal Not. (Dkt. # 22). Because GE Capital, who by that time had reached a settlement with Ms. Lagrone, was unwilling to cooperate informally, Advanced Call Center withdrew its motion to compel arbitration in order to undertake the necessary discovery against GE Capital. (*Id.* at 2.) At that time, Advanced Call Center stated that it intended to re-file its motion once the required discovery was completed. (*See id.* at 2.) Four months later, it did so. (*See* Mot.) Although it appears that Advanced Call Center could have moved more quickly to advance its right to arbitrate, a delay of a few months, without more, is insufficient evidence for the court to conclude that Advanced Call Center "abandoned its right to arbitrate." *See Park Place Assocs.*, 563 F.3d at 921. As such, Ms. Lagrone has not met her "heavy burden" to show "acts inconsistent with" Advanced Call Center's existing right to compel arbitration. *See id.*

//

Even if she had met that burden, Ms. Lagrone fails to show prejudice resulting from Advanced Call Center's delay. Ms. Lagrone complains that, in the interim between Advanced Call Center's motions to compel arbitration, she incurred significant costs while conducting discovery into class certification. (Resp. at 13.) Courts, however, have made clear that an imbalance in litigation or discovery costs over a short period of time does not rise to the level of prejudice necessary to justify a finding of waiver. *See Park Place Assocs.*, 563 F.3d at 921; *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 914 (N.D. Cal. 2011). Additionally, the court notes that Ms. Lagrone was on notice that Advanced Call Centers intended to re-file a motion to compel arbitration, and therefore proceeded with class certification discovery at her own peril. As such, Ms. Lagrone has not met her "heavy burden" to show prejudice. *See Park Place Associates*, 563 F.3d at 921. Because Ms. Lagrone fails to show both acts inconsistent with Advanced Call Center's right to arbitrate and prejudice resulting from any such inconsistent acts, the court finds that Advanced Call Centers has not waived its right to arbitrate. *See id.*

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Advanced Call Center's motion to dismiss and to compel arbitration (Dkt. # 35).

//

//

//

//

The court STAYS the action and ORDERS the parties to undertake arbitration pursuant to the terms of the Agreement. The parties shall submit a joint status report within 10 days of the arbitrator's final determination.

Dated this 2nd day of October, 2014.

JAMES L. ROBART
United States District Judge